IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE

HUNTINGDON RIDGE TOWNHOUSE )
HOMEOWNERS ASSOCIATION, INC., )
)
        **Plaintiff,** )
)
v. )     **No. 08-2609-II**
)
QBE INSURANCE CORPORATION )
and FIRSTLINE NATIONAL )
INSURANCE COMPANY, )
)
      . **Defendants.** )

## COMPLAINT FOR DECLARATORY JUDGMENT

Comes now Plaintiff, Huntingdon Ridge Townhouse Homeowners Association, Inc., ("Huntingdon Ridge"), pursuant to T.C.A. § 29-14-102 and 29-14-103, and alleges as follows:

### I. THE PARTIES

1.    Huntingdon Ridge is a townhouse corporation as that term is defined in T.C.A. § 66-27-102(a)(15) and in that capacity is responsible for the carrying out the duties and obligations imposed by the various covenants, conditions, restrictions and bi-laws governing Huntingdon Ridge as a horizontal property owner.

2.    The Defendant, QBE Insurance Corporation ("QBE"), whose principal place of business is located in Newton, Pennsylvania. QBE is an insurance company which does business in the State of Tennessee. It may be served with process by service on its registered agent for process by certified mail to Commissioner, Tennessee Department of Commerce and Insurance, 500 J. Robertson Parkway, 5th Floor, Nashville, Tennessee, 37243.

3.  Firstline National Insurance Company, ("Firstline"), is an insurance company which principal place of business is located in Maryland. Firstline is an insurance company which does business in the State of Tennessee. It may be served with process by service on its registered agent for process by certified mail to Commissioner, Tennessee Department of Commerce and Insurance, 500 J. Robertson Parkway, 5th Floor, Nashville, Tennessee, 37243.

## II. VENUE AND JURISDICTION

4.  As will be set out more fully below, all acts and/or omissions giving rise to Huntingdon Ridge's claim of loss under the Firstline and ABE policies of insurance referenced hereof occurred in Nashville, Davidson County Tennessee.

5.  The Firstline and QBE policies were issued and delivered in Nashville, Davidson County, Tennessee.

6.  Huntingdon Ridge alleges and avers that an actual controversy exists between it and QBE and Firstline within the meaning of the Tennessee Declaratory Judgment Act, and that this Honorable Court is vested with the power to declare and adjudicate the rights and legal relationships of Huntingdon Ridge, QBE and Firstline with reference to the issues raised herein.

## III. FACTS

7.  Jane C. Cates ("Cates") and Michael Lloyd Meier and his wife, Lisa Ann Meier ("the Meiers") own adjoining units in a residential development in Davidson County known as Huntington Ridge. In the spring of 2004, Cates noticed structural defects in her unit causing her walls to deflect and her unit's floors to sag. She notified the Huntingdon Ridge Townhouse Homeowners Association, Inc., ("the Association")

which initially took responsibility and obtained bids for repairs. In January of 2006, the Meiers began experiencing the same structural defects as Cates' unit and notified the Association of these problems.

8.      The Association did not undertake any repairs because there was a dispute between the Association and owners as to which party would be responsible for the costs of repair.

9.      A structural engineer, Robert Warren, was hired and found the structural defects resulted from the improper handling and installation of the floor truss system during the building's initial construction. He also found the floor trusses were defective. Mr. Warren determined the floor trusses were progressively failing producing the inability of the truss system to sustain loads applied by the walls and roof system. Mr. Warren determined the rate of failure would eventually cause the collapse of the units as well as having an adverse effect to the adjacent units within the same building structure could lead to a catastrophic collapse.

10.     On or about September 8, 2006, Cates and the Meiers filed a Complaint for Declaratory Judgment against Huntingdon Ridge in the Circuit Court for Davidson County. The Complaint requested the Circuit Court to declare the obligations of Huntingdon Ridge to affect the repairs upon Plaintiff's townhomes and whether the Board of Directors has authority to act on behalf of the Association.

11.     In the Memorandum Opinion and Order dated September 5, 2007, the Fifth Circuit Court found the floor trusses, which were at issue in the case, were an integral part of the foundation and should be considered "common elements." Based

upon this ruling Huntingdon Ridge would be required to pay the costs of repair for the damages to the townhomes.

12.    The Circuit Court's ruling was appealed.  The Tennessee Court of Appeals affirmed the ruling.   The Court of Appeals ruled the floor trusses were "common elements" and an integral part of the foundation.   Thus, the costs of repairs are exclusively the responsibility of Huntingdon Ridge.   Based upon the Court rulings, Huntingdon Ridge sought first party coverage under the policies issued by Firstline and QBE.  However, both Firstline and QBE sent certified letters to Huntingdon Ridge denying any coverage under the respective policies.  (Copies of letters of denial from Firstline and QBE attached as Exhibit 1 and 2).

13.    Huntingdon Ridge avers that under these facts and terms of the policies issued to it by Firstline and QBE, Huntingdon Ridge is entitled to coverage for the direct physical loss to the covered property of the "common elements" of its property. Huntingdon Ridge is seeking first party coverage under the Property Coverage provisions found in the Firstline and QBE polices.

14.    Firstline provided insurance for Huntingdon Ridge to the covered property from July 12, 2001 through July 12, 2005.  The policy numbered 937901 with effective dates July 12, 2004 through July 12, 2005 (policy attached as Exhibit 3) provided the following insuring agreement for property damage:

**A.    Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

**1.    Covered Property**

Covered Property, as used in this Coverage Part, means the type of property described in this Section, **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a.**   **Building**, meaning the building or structure described in the Declarations, including:

    **(1)**   Completed additions;

    **(2)**   Fixtures, outside of individual units, including outdoor fixtures;

    **(3)**   Permanently installed:

        **(a)**   Machinery and

        **(b)**   Equipment;

    **(4)**   Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

        **(a)**   Fire extinguishing equipment;

        **(b)**   Outdoor furniture;

        **(c)**   Floor coverings; and

        **(d)**   Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering that are not contained within individual units;

    **(5)**   If not covered by other insurance:

        **(a)**   Additions under construction, alterations and repairs to the building or structure;

        **(b)**   Materials, equipment, supplies, and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure; and

**(6)** Any of the following types of property contained within a unit, regardless of ownership, if your Condominium Association Agreement requires you to insure it:

    **(a)** Fixtures, improvements and alterations that are a part of the building or structure; and

    **(b)** Appliances, such as those used for refrigerating, ventilating, cooking, dishwashing, laundering, security or housekeeping.

But Building does not include personal property owned by, used by or in the care, custody or control of a unit-owner except for personal property listed in Paragraph **A.1.a.(6)** above.

15. The Firstline policy provides additional coverage for "collapse." This policy provision states as follows:

**D.**     **Additional Coverage – Collapse**

The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in **D.1.** through **D.5.** below.

**1.**     With respect to buildings:

    **a.**     Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose;

    **b.**     A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse;

    **c.**     A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building;

    **d.**     A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking,

bulging, sagging, bending, leaning, settling, shrinkage or expansion.

2.    We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if the collapse is caused by one or more of the following:

    **a.**    The "specified causes of loss" or breakage of building glass, all only as insured against in this Coverage Part;

    **b.**    Decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

    **c.**    Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

    **d.**    Weight of people or personal property;

    **e.**    Weight of rain that collects on a roof;

    **f.**    Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in **2.a.** through **2.e.**, we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse.

The criteria set forth in **1.a.** through **1.d.** do not limit the coverage otherwise provided under this Cases of Loss Form for the causes of loss listed in **2.a.**, **2.d.** and **2.e.**

******

4.    If personal property abruptly falls down or caves in and such collapse is not the result of collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

**a.** The collapse was caused by a Cause of Loss listed in **2.a.** through **2.f.** above;

**b.** The personal property which collapses is inside a building; and

**c.** The property which collapses is not of a kind listed in **3.** above, regardless of whether that kind of property is considered to be personal property or real property.

The coverage stated in this Paragraph **4.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

Collapse of personal property does not mean cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

**5.** This Additional Coverage, Collapse, will not increase the Limits of Insurance provided in this Coverage Part.

16. The Firstline policy defines the policy period as follows:

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

**1.** We cover loss or damage commencing:

**a.** During the policy period shown in the Declarations; and

**b.** Within the coverage territory.

17. QBE provided coverage from July 12, 2005 through July 12, 2007 (copy of policy attached as Exhibit 4.) This policy's insuring agreement for property damage states as follows:

**I. PROPERTY DIRECT COVERAGES SECTION**

We will pay for direct physical loss of or damage to "covered property" caused by or resulting from any COVERED CAUSE OF LOSS under III.A. COVERED CAUSES OF LOSS. Coverage is provided only when a limit of insurance is shown in the "Declarations."

Unless otherwise specified, "covered property" must be located within the "coverage territory."

Unless otherwise specified in this section, all EXCLUSIONS under III.B. EXCLUSIONS apply.

Coverage is also provided for "covered property" which is not damaged but which must be removed and replaced in order to repair "covered property" which is damaged by a COVERED CAUSE OF LOSS under III.A. COVERED CAUSES OF LOSS.

18.    The QBE policy's Causes of Loss, Exclusions and Limitations section states as follows:

III.    PROPERTY   CAUSES   OF   LOSS,   EXCLUSIONS   AND LIMITATIONS SECTION

    A.    COVERED CAUSES OF LOSS

        Covered Causes of Loss includes

        IV.    ADDITIONAL   COVERED   CAUSES   OF   LOSS SECTION  and means immediate and direct physical loss or damage to "covered property" unless the loss is excluded under III.B. EXCLUSIONS.

    B.    EXCLUSIONS

        1.    Except as otherwise specified, we will not pay for loss or damage which would not have occurred in the absence of one or more of the following excluded events regardless of:  (a) the cause of the excluded event; (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss:

        2.    We will not pay for loss or damage caused by or resulting from any of the following:

           **d.    "COLLAPSE"**

           "Collapse."

However, if loss or damage by another COVERED CAUSE OF LOSS results at the "premises," we will pay for the resulting loss or damage.

**Except as provided under IV.A. "COLLAPSE" COVERAGE.**

19.     The QBE policy provides the additional coverage for collapse which states as follows:

IV.     PROPERTY ADDITIONAL COVERED CAUSES OF LOSS SECTION

   A.     "COLLAPSE" COVERAGE

      1.     We will pay for direct physical loss or damage to "covered property" if the "collapse" is caused by one or more of the following:

         a.     The "Specified Causes of Loss" or breakage of structural glass, all only as insured against in this Property Coverage Part;

         b.     Decay that is hidden from view, unless the presence of such decay is known to anyone acting on your behalf prior to collapse;

         c.     Insect or vermin damage that is hidden from view, unless the presence of such decay is known to anyone acting on your behalf prior to collapse;

         d.     Weight of people or personal property;

         e.     Weight of rain that collects on a roof;

         f.     Use of defective material or methods in construction, remodeling or renovation if the "collapse" occurs during the course of the construction, remodeling or renovation. However, if the "collapse" occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed in A.1.a. through A.1.e. above, we

will pay for the loss or damage even if use of defective material or methods in construction, remodeling or renovation contributes to the collapse.

The criteria set forth in the definition of "collapse" does not limit the coverage otherwise provided under paragraph III.A. COVERED CAUSES OF LOSS for the causes of loss listed in 1.a., 1.d., and 1.e. above.

2. PROPERTY NOT COVERED – "COLLAPSE"

 a. The following types of property are not covered:

  (1) Outdoor: satellite dishes, radio, television and other antennas, including wiring;

  (2) Masts or towers;

  (3) Awnings;

  (4) Gutters and downspouts;

  (5) Yard fixtures;

  (6) Outdoor "swimming pools";

  (7) Fences;

  (8) Piers, wharves or docks;

  (9) Beach or diving platforms or appurtenances;

  (10) Retaining walls; or

  (11) Walks, roadways or other paved surfaces.

 b. Unless the loss or damage is:

  (1) Caused by "Specified Causes of Loss"; or

    (2)    A direct result of the "collapse" of a building or structure caused by a COVERED CAUSE OF LOSS.

3.    If personal property abruptly falls down or caves in and such event is not the result of "collapse" of a building or structure, we will pay for loss or damage to "covered property" caused by such falling down or caving in of personal property only if the falling down or caving in:

    a.    Was caused by a cause of loss listed in A.1.a. through A.1.f.;

    b.    Is of personal property inside a building or structure; and

    c.    Is of property not of a kind listed in A.2. regardless of whether that kind of property is considered to be personal property or real property.

    The coverage stated in this paragraph 3. does not apply to personal property if marring and scratching, or both, is the only damage to that personal property caused by the falling down or caving in.

20.    The QBE policy defines a "collapse" of property as follows:

11.    **"Collapse"** (PROPERTY) means an abrupt falling down, caving in or flattening of a building, structure or of any part of a building or structure with the result that the building, structure or the collapsed part of either cannot be occupied for its intended. However:

    a.    A building, structure or any part of either that is in danger of falling down or caving in is not considered to be in a state of collapse. This provision applies even if the building has been:
        (1)    Declared by civil authority or by a person technically qualified to do so to be in an imminent state of collapse;
        (2)    Condemned for occupancy for its intended purpose; or,
        (3)    Ordered evacuated in anticipation of imminent collapse.

21.    Finally, the QBE policy defines the policy period as follows:

U.    **"POLICY PERIOD"**

Under this Property Coverage Par we provide coverage for loss or damage during the "policy period."

22.     Huntingdon Ridge is entitled to coverage under both the Firstline and QBE covered property provisions.  Based upon the Circuit Court ruling, which was affirmed by the Court of Appeals, Huntingdon Ridge has suffered a direct physical loss to "covered property."  Firstline and QBE have denied coverage asserting the claim is excluded under the definition of "collapse" found in the respective policies because the loss is not an abrupt falling down, caving in or flattening of the building.  However, these definitions are ambiguous and should be voided.

23.     The definitions of "collapse" found in the Firstline and QBE policies should be voided because the definitions violate Tennessee public policy.  Tennessee courts have adopted the majority rule in ascertaining the existence of a "collapse" for the purposes of insurance coverage in the case of <u>Rankin v. Generalli-US Branch</u>, 986 S.W.2d 237 (Tenn. Ct. App. 1999).  In <u>Rankin</u>, a "collapse" was defined as "substantial impairment of structural integrity."  In the instant case, Cates and the Meiers were told to move from the house to protect their safety whereupon they chose to mitigate their damages and have the repairs made to avoid a "collapse" into dust and rubble.  The <u>Rankin</u> court pointed out, as do numerous other courts, that to require insured to weight for a "collapse" into dust and rubble would violate the principal of mitigation of damages.

24.     The Firstline and QBE policies have definitions of "collapse" which require an "abrupt falling down or caving in of a building" but any building or part of any building which is in danger of falling down or caving in is not in a state of "collapse."  If these definitions are allowed to stand, then it would preclude a finding of "collapse" unless there was indeed a situation where the units had fallen into dust and rubble.

Specifically, coverage is not afforded if "a building, structure or part of either that is standing." This definition "collapse" even precludes a situation wherein an occupant is "ordered to evacuate in anticipation of eminent collapse." QBE policy Section XXVIII. 11. a. (3).

25.    Moreover, the conditions and duties found in the Firstline and QBE policies would lead to the denial of coverage, if the insured failed to act in a reasonable manner to mitigate the abrupt falling down, caving in or flattening of the building. Therefore, if Huntingdon Ridge allowed the floor trusses to abruptly fall down coverage would be denied because Huntingdon Ridge failed to take the reasonable steps of repairing the floor trusses.

26.    The Firstline policy places the following duties on Huntingdon Ridge as follows:

**3.    Duties In The Event Of Loss Or Damage**

    a.    You must see that the following are done in the event of loss or damage to Covered Property:

        (4)    Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

27.    Further, under the Firstline Causes of Loss - Special Form states it will not pay for a loss if Huntingdon Ridge does not do the following:

    2.    We will not pay for loss or damage caused by or resulting from any of the following:

m.   Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

28.   Further, the QBE policy places the following duties on Huntingdon Ridge as follows:

**VI.   PROPERTY CONDITIONS SECTION**
The Property Coverage Part is subject to the following conditions:

**C.   BREACH OF CONDITIONS**
The breach of any condition of this Property Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss, the breach of condition does not exist.

**I.   INSURED'S DUTIES IN THE EVENT OF LOSS OR DAMAGE**

Failure to perform these duties will impair your rights under this Property Coverage Part or could result in denial of coverage.
******
8.   Take all reasonable steps to protect the "covered property" from further damage. If feasible, set the damaged property aside and in the best possible order for examination.

29.   These conditions and duties place Huntingdon Ridge in an impossible position. Huntingdon Ridge to qualify for coverage must comply with Firstline and QBE's conditions and duties and take the reasonable steps of repairing the floor trusses before the abrupt falling in of the building. However, Huntingdon Ridge by repairing the floor trusses would no longer be entitled to coverage because Huntingdon Ridge's actions prevented an abrupt falling down, caving in or flattening of the building. Since any action by Huntingdon Ridge would result in the denial of coverage for the damage to the covered property, the definitions of "collapse" found in the Firstline and QBE policies are ambiguous and should be voided because the definitions violates Tennessee Public Policy.

30.    Finally, this loss occurred during the policy period for both Firstline and QBE.  The Firstline policy requires the loss or damage to "commence" during its policy period.  Based upon expert and lay testimony the collapse of the tenants' property commenced in 2004, which is within Firstline's policy period.  Further, the QBE policy provided coverage for loss or damages, which occurred "during" the policy period.  Again, based upon the expert and lay testimony the tenants' property was on the verge of a total collapse, meaning falling to dust and rubble in May of 2007, which is within QBE's policy period.

31.    Firstline also provided Directors and Officers Liability insurance for Huntingdon Ridge from June 12, 2001 through June 12, 2005.  The Policy No. 937901 with the effective dates of June 12, 2004 through July 12, 2005 (policy attached as Exhibit 3.).  The insuring agreement for Directors and Officers provides as follows:

**SECTION I – COVERAGE**

**A.    INSURING AGREEMENT**

    **1.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "loss(es)" arising out of any "wrongful act(s)" to which this policy applies subject to the applicable retention and within the limits of liability specified.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTAY PAYMENTS.  This insurance does not apply to any "wrongful act(s)" committed before the Retroactive Date, if any, shown in the Declarations or committed after the policy period shown in the declarations.  The "loss" arising out of "wrongful acts" must take place in the "coverage territory".  We will have the right and duty to defend any "loss" arising out of "wrongful acts" and seeking damages.  But:

        **a.**    The amount we will pay for damage is limited as described in Section III – LIMITS OF INSURANCE;

**b.** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements; and

**c.** We may investigate any "loss" arising out of "wrongful acts" at our discretion; and pay on behalf of the insured. However, if any insured shall:

　　**(1)** Refuse to consent to any settlement we recommend in writing; or

　　**(2)** Continue any legal proceedings in connection with such "loss" arising out of "wrongful acts"; then our liability shall not exceed the amount for which the "loss" could have been settled (including costs, charges and expenses incurred with our consent) as of the date of such refusal.

**d.** This insurance applies to any "wrongful act(s)" only if a claim is first made against any insured during the policy period subject to:

　　**(1)** A claim by a person or organization seeking to hold the insured responsible for a "loss" arising out of a "wrongful act" will be deemed to have been made when notice of such claim is received and recorded by any insured or by us or an authorized agent of our company, whichever comes first.

　　**(2)** All claims for "losses" arising out of "wrongful acts" to the same person or organization will be deemed to have been made at the time the first of those claims is made against any insured.

32. The Firstline policy providing coverage for Directors and Officers Liability

sets forth a policy period as follows:

**SECTION IV – POLICY PERIOD**

This policy, subject to the Retroactive Provision, applies only to "wrongful acts" committed during the period set out in the Directors and Officers Liability for Nonprofit Organizations Coverage Declaration.

33.     The Firstline policy providing coverage for Directors and Officers liability provides the following definitions:

**SECTION VIII – DEFINITIONS**

C.      "Wrongful act(s)" means any negligent act, any error, omission or breach of duty of your directors or officers while acting in their capacity as such.

D.      "Loss(es)" under this policy is any event(s) arising out of a "wrongful act(s)" and shall include:

Cost of investigation and defense of actions, claims or proceedings, and appeals made against the directors or officers for "wrongful acts," negligent acts, errors, omissions, or breach of duty as well as indemnities due the directors or officers pursuant tot he4 operation of law or as otherwise authorized in the by-laws or articles of incorporation which determine and define such rights of indemnity, occurring during the policy period.

34.     This Directors and Officers Liability policy provides coverage for losses arising out of "wrongful acts" of the Huntingdon Ridge Directors and Officers.   "Wrongful acts" include any negligent acts, errors, omissions, or breaches of duties by the directors or officers.   The Cates and the Meiers' Complaint alleged that the Huntingdon Ridge Board failed in its duty to repair the property, and then failed to honor its agreement to make the repairs.   These allegations constitute a wrongful act under the policy's definition and any events arising out the wrongful act would constitute losses.   Therefore, Huntingdon Ridge is entitled to coverage under Firstlines' Directors and Officers Liability policy.

35.     The QBE policy also provides coverage for Directors and Officers Liability, (copy of policy attached as Exhibit four) with an insuring agreement which states as follows:

XXI.    DIRECTORS AND OFFICERS LIABILITY COVERAGES SECTION

**This insurance covers all sums that the insured becomes legally obligated to pay for "loss" to which this insurance applies.**

**No other obligation or liability to pay sums or perform acts or services is covered unless specifically provided for under XXIV. DIRECTORS AND OFFICERS LIABILITY LIMITS OF INSURANCE SECTION, XXV. DIRECTORS AND OFFICERS LIABILITY EXTENDED REPORTING PERIOD SECTION and XXVI. DIRECTORS AND OFFICERS LIABILITY CONDITIONS SECTION.**

A.      ERRORS AND OMISSIONS INSURANCE

We will pay on behalf of the insured all "loss" such insured becomes legally obligated to pay as damages because of a "wrongful act" committed in the "coverage territory." Insurance is provided by this Directors and Officers Liability Coverage Part for any "wrongful act" that is:

1.      Committed on or after the Retroactive Date, if any, shown in the "Declarations" and before the expiration of the "policy period"; and

2.      Reported to us in accordance with XXVI.C. REPORTING AND NOTICE; or

3.      Reported to us during the Extended Reporting Period, if exercised, in accordance with XXV. DIREFTORS AND OFFICERS LIABILITY EXTENDED REPORTING PERIOD SECTION.

We may investigate any "claim" or "suit" at our discretion. At our option, we may consent to the defense of any such "claim" or "suit" by the insured. With regard to any "claim" or "suit" we allow an insured to defend, we have the right to associate with such insured's defense counsel and to monitor and be advised of defense strategies and activities and expenses incurred for defense as they are incurred.

36.    The QBE policy providing coverage for Directors and Officers Liability

provides the following definitions:

XXVIII. DEFINITIONS SECTION
**Entries in parentheses indicate Policy Coverage Parts to which defined terms apply.**

10.    **"Claim"** (DIRECTORS AND OFFICERS) means:
A written demand, sent by a person or organization, demanding either damages or the performance of a specific act, or both.

39.    **"Loss"** (DIRCETORS AND OFFICERS) means the damages the insured is legally obligated to pay because of judgments or settlements arising out of "claims" or suits" alleging "wrongful acts." "Loss" does not include "defense costs."

76.    **"Suit(s)"** (DIRECTORS AND OFFICERS) means a civil proceeding in which damages or nonpecuniary relief to which this insurance applies are alleged.

"Suit" includes:

a.    An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

b.    Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

c.    A civil proceeding commenced by the service of a complaint or similar pleading:

d.    A formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document.

38.    QBE's Directors and Officers Liability policy provides coverage for

"losses" i.e. damages Huntingdon Ridge is legally obligated to pay because of

judgments or settlements arising out of "suits." Based upon the Court of Appeals'

opinion affirming the Trial Court's ruling Huntingdon Ridge is legally obligate to pay Cates and Meiers for the repair costs incurred and/or additional costs to repair. This "loss" is entitled to coverage under QBE's Directors and Officers Liability policy because the Cates and Meiers' suit alleged that the Huntingdon Ridge Board failed in its duty to repair the property, and then failed to honor its agreement to make the repairs. These allegations constitute a wrongful act under the policy's definition and any events arising out the wrongful act would constitute losses.

39. QBE has relied on the following exclusion to deny coverage under the Directors & Officers Liability Coverage:

### K.   INJURY AND DAMAGE

> Where all or part of such "claim" is directly or indirectly, based on, attributable to, caused by, arising out of, resulting in or relating in any way to "bodily injury," "property damage," "personal injury" or "advertising injury."

40. This exclusion is only applicable to "claims" not "suits." In this case, the "loss" Huntingdon Ridge is obligated to pay arises from a "suit" not a "claim." Therefore, Huntingdon Ridge is entitled to coverage under QBE's the Directors & Officers Liability Coverage.

## IV. DECLARATORY RELIEF SOUGHT

41. Huntingdon Ridge avers and alleges the Firstline and QBE policies provide coverage for costs of repair to the floor trusses because pursuant to the Circuit Court's ruling that the floor trusses were a "common element" and Huntingdon Ridge was responsible for the costs of repair. Specifically, Huntingdon Ridge contends the definitions of "collapse" found in the Firstline and QBE policies are ambiguous and

should be voided because it violates Tennessee public policy. Since, these definitions of "collapse" are voided Firstline and QBE must provide coverage for the costs of repairs pursuant to the terms and conditions of the policies. Further, Huntingdon Ridge avers and alleges it is entitled to coverage under Firstline's and QBE's Directors and Officers Liability policies.

42.    Premises considered, Huntingdon Ridge prays as follows:

(1).    That the defendants be required to answer and appear herein;

(2).    That the Court adjudicate and declare the respective rights and obligations of Firstline and QBE to Huntingdon Ridge with respect to coverage sought under the policies;

(3).    For such other and further legal and equitable relief as this Court deems just and proper.

Respectfully submitted,

**PARKS T. CHASTAIN**
Registration No. 13744
**GORDON C. AULGUR**
Registration No. 19953
Attorneys for Plaintiff

**BREWER, KRAUSE, BROOKS,**
**CHASTAIN & BURROW, PLLC**
P.O. Box 23890
Nashville, TN 37202-3890
(615) 256-8787

## COST BOND

This is to certify the undersigned is surety for costs in this cause up to $1,000.00.

**BREWER, KRAUSE, BROOKS,**
**CHASTAIN & BURROW**
P. O. Box 23890
Nashville, TN  37202-3890
(615) 256-8787

by:  _____
GORDON C. AULGUR
Registration No. 19953